**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JAMES BLACKWOOD,

                              Plaintiff,

        v.                                                            No. 07-CV-388
                                                                           (DRH)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

**APPEARANCES:**                          **OF COUNSEL:**

STEPHEN J. MASTAITIS, JR. ESQ.
1412 Route 9P
Saratoga Springs, New York 12866

HON. GLENN T. SUDDABY                KARLA J. GWINN, ESQ.
United States Attorney for the            Special Assistant United States Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**


## MEMORANDUM-DECISION AND ORDER

Plaintiff James Blackwood ("Blackwood") brought this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

Blackwood moves for a finding of disability and the Commissioner cross-moves for a

judgment on the pleadings.  Docket Nos. 8, 13.  For the reasons which follow, the

Commissioner's decision is affirmed.

## I. Procedural History

On April 22, 2004, Blackwood filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 <u>et seq</u>. T. 43-46.[1]  That application was denied on November 9, 2004.  T. 23-26.  Blackwood requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Carl Stephan on February 1, 2006.  T. 29, 222-39.  In a decision dated July 21, 2006,  the ALJ held that Blackwood was not entitled to disability benefits.  T. 12-21.  On August 1, 2006, Blackwood filed a request for review with the Appeals Council.  T. 9.  The Appeals Council denied Blackwood's request for review on February 15, 2007, thus making the ALJ's findings the final decision of the Commissioner.  T. 3-6.  This action followed.

## II. Contentions

Blackwood contends that the ALJ erred when he failed to (a) credit properly his subjective complaints of pain, (b) consider properly  the opinions of Blackwood's treating physicians, and (c) find that the record lacked substantial evidence to conclude that Blackwood had the residual function capacity ("RFC") to perform work which existed in significant numbers in the national economy.  The Commissioner contends that there was substantial evidence to support the determination that Blackwood was not disabled.

---

[1] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 3.

### III. Facts

Blackwood is currently forty-three years old and received a General Educational Development ("GED") diploma.  T. 225, 227.  Blackwood has worked as an automotive mechanic, production worker, and, most recently, a truck driver.  T. 70-71.  Blackwood alleges that he became disabled on September 13, 2002 from degenerative disc disease of the lumbar spine and from glaucoma.  T. 12, 14.

### IV.  Standard of Review

#### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ." 42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  Ventura v. Barnhart, No. -4 Civ. 9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing

Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to

determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial burden

of proof to establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177,

1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth

step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage

in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the

correct legal standards were applied and whether substantial evidence supports the

decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a mere scintilla,"

meaning that in the record one can find "such relevant evidence as a reasonable mind

4

might accept as adequate to support a conclusion.'" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (internal citations omitted)).

   "In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." <u>Barringer v. Comm'r of Soc. Sec.</u>, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  <u>Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); <u>Halloran</u>, 362 F.3d at 31.

### V.  Discussion

#### A. Medical Evidence

#### 1. Degenerative Disc Disease

   Blackwood alleges that he became disabled on September 13, 2002 due to degenerative disc disease and glaucoma.  T. 14.  Blackwood underwent an MRI on November 20, 2002.  T. 95-96.  The MRI showed multiple disc bulges and protrusions.  <u>Id.</u> The impression was that Blackwood had degenerative disc disease and that the bulging was causing displacement of his left S1 nerve root.  T. 95.

   On January 14, 2003, Blackwood began seeing Dr. James Greenspan concerning his back injury.  T. 130-32.  Dr. Greenspan's initial conclusions were that Blackwood was

100% disabled despite having no tenderness in his spinal regions, retaining good range of motion, and little pain.  T. 131.  At this point, surgery was not necessary, but physical therapy and steroid injections were recommended.  T. 132.  On March 29, 2003, Blackwood had an appointment with Dr. Leonard Gleman.  T. 97.  Dr. Gleman noted that Blackwood's pain was transient, though it intensified when he was moving about for any length of time.  Id.  Additionally, although Blackwood's straight-leg raises[2] showed discomfort, he was able to sit up and his power, tone, and sensation were all within normal limits.  Id.  Dr. Gelman diagnosed Blackwood with a back strain and also recommended physical therapy and other routine conservative methods with follow-up appointments as needed.  Id.

   On May 20, 2003, Blackwood was again examined by Dr. Greenspan.  T. 127-28. Blackwood continued to suffer from lower back and left leg pain which Dr. Greenspan stated was "more likely than not related to a herniated disc . . . ."  T. 127.  Blackwood indicated that he did not want to pursue surgical intervention, so he was again recommended to undergo physical therapy and potential steroid injections.  Id.  The physical examination revealed that Blackwood had no back tenderness, there was no evidence of spasticity, focal, motor, or sensory changes, and his gait was normal.  T. 127. Dr. Greenspan stated that, at this point, Blackwood was no more than 62 ½%, or moderate to marked, disabled.  T. 128, 129.  On August 12, 2003, Blackwood saw Dr. Greenspan again.  T. 124-25.  Blackwood's back and leg pain was still present and the

---

[2]A positive straight-leg, or Lasegue, test is indicative of a herniated disc in the back. See, e.g., Univ. of Fla. Dep't of Neurosurgery Patient Information (visited June 30, 2008) <http://www.neurosurgery.ufl.edu/Patients/lumbar.shtml>.

current pain medication was not effectively alleviating his discomfort.  T. 124.  The physical examination again revealed no tenderness or motor or sensory changes although straight leg raises on the left were positive.  Id.  Blackwood was given a prescription for Vicoden and deemed 66 ⅔% disabled.  T. 126.  A month later Blackwood saw Dr. Greenspan again.  T. 121-22.  Dr. Greenspan's notes indicated no changes in Blackwood's condition, with the exception that Blackwood was now experiencing mild tenderness over his spine.  T. 121.

On October 16, 2003, Blackwood underwent an independent medical examination with Dr. Charles Kalman for his Workers' Compensation claim.  T. 98.  Dr. Kalman concluded that Blackwood was suffering from a temporary, moderate to marked, partial disability.[3]  Id. A few weeks later Blackwood met with Dr. Greenspan.  T. 118-19.  Dr. Greenspan agreed that Blackwood was suffering from multilevel degenerative disc space changes and disc bulges but no significant herniations.  T. 118.  Additionally, Dr. Greenspan noted that Blackwood had a normal gait and that his physical examination was relatively unchanged except for a slightly improved range of motion in his back.  Id.  Despite these physical improvements, Dr. Greenspan diagnosed him with a 75%, marked temporary disability.  T. 119.

On January 16, 2004, Blackwood underwent an EMG/Nerve Conduction Study with Dr. Shawn Jorgensen.  T. 100-03.  The study revealed normal results with no sign of

---

[3]Disability standards under the Act differ significantly from those applicable under various states' Workers' Compensation laws.  Crowe v. Comm'r of Soc. Sec., No. 01-CV-1579, 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (citing Gray v. Chater, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995) ("Workers' [C]ompensation determinators are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act.")).

radiculopathy[4] or neuopathy[5].  T. 100-01.  Additionally, Dr. Jorgensen noted that

Blackwood's motor strength and sensation for his lower limbs were completely intact.  T.

102.  On March 3, 2004, Blackwood underwent a consultative exam with Dr. Jeffrey

Lozman.  T. 104.  However, given the record provided to him, Dr. Lozman refused to give

a "work related evaluation . . . [because] it is unfair to try to judge the patient's level of

disability or impairment based on lack of information."  Id.

On May 11, 2004, Blackwood was evaluated by Dr. William Byrt.  T. 105-06.  Dr. Byrt

noted that although Blackwood walked with a slight limp, had tenderness in his back, and

had a decreased range of motion, he had no obvious discomfort sitting, could walk on his

toes and heels with minimal pain, had no swelling, atrophy, deformity, spasm, or swelling,

and his motor strength and sensation were in tact.  T. 105.  Dr. Byrt noted that recent x-

rays were unremarkable, diagnosed Blackwood with sciatica,[6] and recommended

returning to work, noting that Blackwood would still be experiencing pain.  T. 105, 106.

On May 19, 2004, Blackwood underwent another examination with Dr. Greenspan.  T.

112-13.  Dr. Greenspan noted that Blackwood had recently had a steroid injection, and

despite his claims that it had not relieved his pain, Blackwood was scheduled to receive a

second injection in the near future.  T. 112.  Blackwood continued to walk with a limp and

complained of lower back and leg pain although he had no tenderness during palpation.

---

[4] Radiculopathy is a "disease of the nerve roots."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1404 (28th ed. 1994) [hereinafter "DORLAND'S"].

[5] Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system . . . ."  DORLAND'S 1132.

[6] Sciatica is "a syndrome characterized by pain radiating from the back . . . into the lower extremity . . . most commonly caused by protrusion of a low lumbar . . . disk."  DORLAND'S 1493.

Id.  During another follow-up appointment with Dr. Greenspan a month later, Dr. Greenspan stated that Blackwood "has had two MRIs in the last year that did not show any surgical pathology," and that "[a]t the present time there is really nothing else [Dr. Greenspan could] offer Mr. Blackwood from a neurosurgical perspective."  T. 108, 109. Despite his degenerative disc space changes, Blackwood still ambulated without assistance, had no tenderness over his lower back, and could flex forward and touch his knees before feeling discomfort.  Id.  Dr. Greenspan concluded that Blackwood was 75% disabled.  T. 109-11, 114, 115, 129.

   On August 4, 2004, Blackwood was again examined by Dr. Jorgensen.  T. 145-47.  Dr. Jorgensen stated that after reviewing Blackwood's three MRIs, he believed that Blackwood had a central bulge at L5-S1 with neural foraminal stenosis[7] and arthropathy[8] at L4-L5 with neural foraminal stenosis, and arthropathy at L3-L4 with central stenosis.  T. 145.  Blackwood could carry out his daily routine and activities of daily living independently, his gait and stride were normal, there was mild pain to palpation of his back, the range of motion in his back was slightly limited, and his lower limb sensations were all in tact.  T. 146, 147.  Dr. Jorgensen stated that he was "moderately disabled [and that h]e should not be lifting greater than twenty pounds, bending, kneeling or crawling more than occasionally, or standing or sitting for greater than an hour at a time without a break."  T. 147.  On October 6, 2004, the diagnosis, prognosis, and functional limitations remained the same.  T. 143-44.

_____

[7]Central and foraminal narrowing, also called spinal stenosis, is spinal canal or foramina constriction resulting in back pain caused by pressure being exerted on the nerve roots.  THE MERCK MANUAL 477 (17th ed. 1999).

[8] Arthropathy is "any joint disease."  DORLAND'S 141.

9

On November 3, 2004, Blackwood underwent a physical residual functional capacity ("RFC") evaluation by Dr. Robert Kahler.  T. 134-39.  Dr. Kahler concluded that Blackwood could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk six hours in a normal workday, sit for six hours in a normal workday, and push and pull without limitations.  T. 135.  Dr. Kahler recognized Blackwood's history of degenerative disc disease but also noted that the EMG was unremarkable, there has been no pain with palpation, and Blackwood could bend forward and touch between his knees. Id.  Additionally, Dr. Kahler concluded that Blackwood could frequently climb, balance, kneel, and crawl, as well as occasionally stoop and crouch.  T. 136.

On December 1, 2004, Dr. Jorgensen noted that physical therapy seemed to be helping despite Blackwood's arthropathy, stenosis, and possible radiculopathy.  T. 141.  Upon examination of Blackwood's lower back, all signs of pain were negative, motor strength was good, and his gait was normal.  T. 142.  Dr. Jorgensen again stated that Blackwood was limited to lifting no more than twenty pounds, only occasionally bending, kneeling and crawling, and not sitting or standing for more than an hour without a break.  Id.  For the next six months, Blackwood saw Dr. Jorgensen three more times with little change noted. T. 169-70, 167-68, 65-66.

On September 12, 2005, Dr. Jorgensen noted that physical therapy was no longer helpful to Blackwood.  T. 162.  Blackwood's pain was without significant change and he stated that he was neither having difficulty walking nor climbing stairs.  Id.  Blackwood did not have an antalgic gait[9] the day of the examination, his range of motion had improved,

---

[9] An antalgic gait is one "assumed so as to lessen pain."  DORLAND'S 90.

and straight-leg raises were negative; however, Dr. Jorgensen continued the same physical restrictions on Blackwood and found him moderately disabled.  T. 163.  On December 7, 2005, Blackwood reported to Dr. Jorgensen that he was declining.  T. 173. Blackwood did not appear to be in distress, did not have an antalgic gait, had no difficulty sitting down or rising from a seated position, and had a normal examination of his lumbosacral spine, although he had mild hypesthia[10] to pinprick in his left calf.  T. 174.  Dr. Jorgensen still opined that Blackwood was moderately disabled.  Id.

On March 10, 2006, Dr. Jorgensen noted that while Blackwood was in no acute distress, he was clearly in pain, had an antalgic gait, had difficulty sitting and standing, had pain to palpation, and exhibited a decreased range of motion.  T. 177-78.  On May 21, 2006, an MRI showed a diffuse disc bulges at L2-L3 and L3-L4 and a disc protrusion/herniation at L5-S1.  T. 205-06.  Additionally, while there was no central or foraminal narrowing at L2-L3, there was mild central narrowing and moderate foraminal narrowing at L3-L4 which was progressing, and mild foraminal narrowing at L5-S1 which seemed relatively unchanged.  Id.

On June 8, 2006, Dr. Ernest Abeles, a consultant, concluded that Blackwood had a disability due to back pain.  However, the disability did not meet or exceed a listed impairment because the conduction tests were negative and there were no supporting MRI results for Blackwood's contentions, only treatment notes.  T. 195-202.  Dr. Abeles found that Blackwood could occasionally lift twenty pounds, frequently lift ten pounds, could push and pull on a limited basis with his lower extremities, could occasionally climb,

---

[10] Hypesthia indicates an "abnormally decreased sensitivity, particularly to touch." DORLAND'S 803, 806.

balance, crouch and crawl, frequently kneel and stoop, and could stand, sit or walk without limitation in a work day.  T. 199-200.

On July 28, 2006, Dr. Jorgensen noted that Blackwood had tried drug trials with six pain relievers, to no avail.  T. 213.  Additionally, it was noted that Blackwood's range of motion was limited in his lumbosacral spine.  T. 214.  Dr. Jorgensen also stated that Blackwood was "working an office job in which he has actually been allowed to change positions which seems to be working reasonably well."  T. 213.  Later that fall, Blackwood had nerve blocks inserted by Dr. Charles Gordon.  T. 215-21.  During the first appointment on August 25, 2006, Dr. Gordon noted that Blackwood had an abnormal gait, with no evidence of exaggerated pain behavior, or spinal tenderness, and persistent pain despite multiple conservative therapies.  T. 218-19.  On October 15, 2006, Dr. Gordon administered the nerve blocks to Blackwood and stated that "proceed[ing] further w[ith] facet blocks would not benefit the patient significantly."  T. 215.

On December 13, 2006, Blackwood had a final appointment with Dr. Jorgensen.  T. 210-13.  Blackwood did not have an antalgic gait, his range of motion was limited in all places but he had not further deteriorated from the previous visit, there was no pain or spinal tenderness, and his motor and sensation were both intact.  T. 211.  Dr. Jorgensen again stated the same physical limitations that Blackwood was limited to lifting no more than twenty pounds, only occasionally bending, kneeling and crawling, and not sitting or standing for more than an hour without a break.  T. 212.

During the administrative hearing, Blackwood testified that he had his driver's license but only drove once a week because it hurt to sit and use the pedals.  T. 226.  Additionally, Blackwood stated that he could no longer go grocery shopping or do housework but was

still able to mow the lawn around his mobile home.  T. 233.  Blackwood also stated that he

could push snow from his stairs in the winter but that his daughters lifted and cleared the

snow from the property.  T. 234.  Blackwood testified that he spent most of his time

reading and would also go online to read the paper but must get up every fifteen to twenty

minutes to walk around or lean against a wall to relieve the pressure on his lower back.  T.

235-36.  Blackwood further contended that due to his disability, he was no longer able to

build and restore cars.  T. 237.


## 2. Glaucoma

Blackwood has also been diagnosed with narrow-angle glaucoma.[11]  T. 149, 150, 154,

159.  On December 6, 2004, Blackwood underwent corrective laser surgery for his

condition.  T. 151, 153.  Blackwood underwent a second, touch-up surgery on March 9,

2005.  T. 150.  Dr. Christopher Gabriels evaluated Blackwood for New York State on May

11, 2006.  T. 182-84.  Dr. Gabriels found that Blackwood's corrected vision was 20/25 in

both eyes, his corneas were clear, his irises, pupils, retinas, and optic nerves were all

normal, he had full fields of vision in both eyes, there was no optic nerve damage or

neuropathy, and his corrective surgeries were functioning well with pressure control.  T.

183.

During the administrative hearing, Blackwood testified that computer screen glare

irritated his eyes.  T. 236.  Additionally, he stated that he could only view an object for

---

[11]Glaucoma is a disease of the eye characterized by increased eye pressure, pain,
and decreased vision.  DORLAND'S 697.  Narrow-angle glaucoma is "glaucoma caused by
closure of the anterior angle by contact between the iris and the inner surface of the
trabecular meshwork . . . ."  Id. at 697-98.

approximately half an hour before his eyes hurt and he needed to use eye drops.  T. 237.

The drops took about thirty minutes to alleviate his pain.  Id.  However, if after applying the

drops Blackwood began to read again, the relief from the drops only lasted another thirty

minutes before he repeated the cycle.  Id.  Blackwood further contended that due to his

disability, he was no longer able to build and restore cars.  Id.


**B. Treating Physician's Rule**

 Blackwood contends that the ALJ did not give proper weight to the opinions of Drs.

Greenspan and Jorgensen who found him to be disabled.  The Commissioner argues that

the ALJ properly determined the weight to be accorded the treating sources' opinions.

   When evaluating a claim seeking disability benefits, factors to be considered include

objective medical facts, clinical findings, the treating physician's diagnoses, subjective

evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d

123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the

regulations, a treating source's opinion is entitled to controlling weight if well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with

other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221

F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must

provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

   The ALJ is required to assess the following factors in determining how much weight to

accord the physician's opinion: "(I) the frequency of examination and the length, nature,

and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the

opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

Despite Blackwood's argument to the contrary, the ALJ was not obligated to give controlling weight to the opinions of Drs. Greenspan and Jorgensen regarding Blackwood's degree of disability as the decision whether a claimant is disabled is reserved to the Commissioner.  Snell, 177 F.3d at 134; 20 C.F.R. § 404.1527(e).  The ALJ gave "great weight to the opinion of Dr. Jorgensen as it pertained to [Blackwood's ability to lift and carry no more than [twenty] pounds . . . [because it] is supported by objective medical evidence."  T. 19.  However, the ALJ gave "little weight to the opinion of Dr. Jorgensen as it pertained to [Blackwood's] ability to engage in prolonged sitting or standing . . ." because, for the most part, Blackwood's gait, strength, and sensation all remained normal which would not support such a severe limitation.  Id.  In contrast, the ALJ accorded significant weight to Dr. Abeles' medical evaluation and some weight to Dr. Byrt's opinion that Blackwood could return to work which would be "moderately limited by his pain."  Id.

There is no dispute that Blackwood's back ailment prevented him from lifting and carrying more than twenty pounds and only occasionally kneeling, bending, and crawling. However, there is dispute over the amount of time Blackwood could sit and stand during the course of a normal workday.  Dr. Jorgensen stated that Blackwood should not sit or

stand for more than an hour without a break.  T. 142, 144, 147, 163, 166, 168, 174-75, 178.  Despite Blackwood's MRIs which showed central and foraminal narrowing, the severe physical restrictions he has alleged are not supported by substantial evidence in the record.  First, as the ALJ correctly indicated, Dr. Jorgensen's own examinations revealed relatively benign conditions in that Blackwood had normal motor and muscle strength and sensation in his lower body and that his nerve conduction studies were also normal.  T. 100, 102, 142, 144, 146-47, 166, 168, 170, 178, 211.  Additionally, while Blackwood has most recently been found to have a slightly decreased range of motion in his lumbar spine, records with Dr. Jorgensen reveal that his gait was generally normal and his straight-leg raises and level of pain during palpation were overwhelmingly negative.  T. 142, 143, 146, 163, 166, 168, 170, 174, 178, 211, 214.  Moreover, Dr. Jorgensen's notes indicate that the only time Blackwood's ability to walk and climb stairs was discussed, Blackwood indicated that he was not having trouble doing either activity.  T. 162.  Additionally, Dr. Jorgensen also noted an employment attempt at an office where Blackwood was having a successful time changing positions which "work[ed] reasonably well."  T. 213.

These medical findings are also supported by other medical sources.  The notes of Blackwood's other treating physician, Dr. Greenspan, indicate that Blackwood routinely had no tenderness over his spinal regions, there was no evidence of spasticity, motor, or sensory changes, and Blackwood could ambulate independently and with a relatively normal gait.  T. 108, 112, 118-19, 124, 127, 131.  Consulting physicians also found similar results.  Dr. Gelman noted that Blackwood's power, tone, and sensation were all normal.  T. 97.  Dr. Byrt noted that there was a decreased range of motion and trace limp; however,

he also stated that Blackwood's strength and sensation were intact and recommended his return to work.  T. 105-06.  Additionally, Dr. Abeles stated that Blackwood's back ailments should have no effect on his ability to sit, stand, or walk.  T. 199-200.  Blackwood incorrectly argues that consultative examiners' opinions deserve little weight in the overall evaluation of the medical record.  See, e.g., Monguer v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) ("It is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence.") (citations omitted); Provost-Harvey v. Comm'r of Soc. Sec., No. 06-CV-1128, 2008 WL 697366, at *6 (N.D.N.Y. Mar. 13, 2008) ("[t]he evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence.") (citations omitted).

Lastly, Blackwood's contradictory testimony seems to both support and deny such contentions.  While Blackwood states that he could not sit for more than twenty minutes at a time and was unable to walk around the grocery store, he was still engaged in mowing his lawn and assisting his daughters in removing snow from his property.  T. 232-35.  Such physical outdoor activities appear inconsistent with such alleged stringent physical limitations.

Therefore, the ALJ's decision to accord Dr. Jorgensen's opinion little weight concerning Blackwood's limitations to sit, stand, and walk is supported by substantial evidence in the record derived from objective medical evaluations, Dr. Jorgensen's own notes, and Blackwood's contradictory testimony.  Furthermore, the ALJ's decision to accord the report of Dr. Abeles, an orthopaedist specializing in this area, significant weight is also supported by substantial evidence in the record.

17

Accordingly, the Commissioner's finding in this regard is affirmed.

### C.  Subjective Complaints of Pain

Blackwood contends that the ALJ's decision to discredit his subjective complaints of pain was in error. The Commissioner contends that the ALJ properly considered Anderson's symptoms.

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).  This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003). "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'" Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003).  "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings."  Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing

Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)).  However, "disability requires more than mere inability to work without pain."  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings."  Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978).  The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (I)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve

> . . . pain or other symptoms (e.g., lying flat on [his] back,
> standing for 15 to 20 minutes every hour, sleeping on a board,
> etc.); and
>
> (vii) Other factors concerning [the claimant's] functional
> limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Blackwood's allegations "concerning the intensity, persistence and limiting effects of [his back pain and glaucoma] are not entirely credible." T. 17.  The ALJ discussed Blackwood's daily activities including his indication that he can independently carry out his daily routine.  T. 146.  Additionally, while Blackwood testified that he cannot grocery shop or do housework, he does his own laundry, mows the lawn, and assists his daughters with snow removal.  T. 232-35.  The ALJ also discussed Blackwood's treatment regimen.  Although Blackwood's treatment appears extreme because he has undergone a myriad of pain medication regiments, his course of treatment has remained conservative with physical therapy and injections as he is not a candidate for surgery.  T. 97, 106, 127, 132.  Blackwood also testified that he had to change positions every twenty minutes to accommodate his back pain.  T. 235-36. However, as the ALJ noted, that is inconsistent with his treating physician's notes which indicated that, for some period of time, Blackwood was employed and successfully managing his condition by changing positions throughout the day.  T. 213.  Moreover, as previously discussed, Blackwood's negative conduction studies and retained normal gait, motor strength, and sensation would also indicate that his symptoms were not as severe as he asserted.  Based upon the foregoing, there is substantial evidence to support the ALJ's conclusion that Blackwood's subjective complaints of pain were not at a disabling

level.

Additionally, Blackwood claims that the ALJ did not properly credit his testimony concerning how easily his eyes were irritated and rendered non-functional by his glaucoma.  Blackwood asserts that he could only view something for twenty minutes before requiring eye drops and rest.  T. 237.  However, according to Blackwood's testimony, he spent his days primarily reading and watching television.  T. 235.  In assessing Blackwood's credibility, the ALJ discussed the objective medical evidence in detail, which concluded that Blackwood's corrective surgeries restored his vision to 20/25 in both eyes and that he had full visual fields in both eyes with no optic nerve damage or optic neuropathy.  T. 182-83.  Thus, it appears that the corrective surgeries and pressure control have rendered Blackwood's eyes fully functional with no permanent damage. Additionally, the ALJ stated that if Blackwood's visual impairments were as disabling and severe as he contended, Blackwood would be unable to spend his day primarily watching television and reading.  T. 19.  Based upon the foregoing, there is substantial evidence to support the ALJ's conclusion that Blackwood's subjective complaints of pain were not at a disabling level.

Therefore, the Commissioner's determination on this ground is affirmed.


**D. RFC**

Blackwood contends that substantial evidence does not support the ALJ's findings regarding his RFC.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and

21

other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R.  §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

   The Grids do not provide the exclusive framework for making a disability determination if a claimant suffers from non-exertional impairments that "significantly limit the range of work permitted by exertional limitations."  Id. at 39 (quoting Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986) (citation omitted)).  Rather, the ALJ should elicit testimony from a vocational expert to determine if jobs exist in the economy that the claimant can still perform.  Bapp, 802 F.2d at 604-05.  Work capacity is "significantly diminished" if there is a loss of work capacity that narrows the possible range of work available and deprives the claimant of a meaningful employment opportunity.  Id. at 605.  Non-exertional impairments include "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching."  20 C.F.R. § 404.1569a(c)(1)(vi) (2005).  The applicability of the grids should be considered on a case-by-case basis.  Bapp, 802 F.2d at 605.  However, the "mere existence of a non-exertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines."  Id. at 603.

   Here, the ALJ concluded that Blackwood could no longer perform his past relevant work but could perform the full range of light work.  T. 20.  Light work is defined as "lifting

no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to

10 pounds.  Even though the weight lifted may be very little, a job is in this category when

it requires a good deal of walking or standing, or when it involves sitting most of the time

with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b) (2005).

The ALJ used the Grids to determine that other work existed in the national economy

that Blackwood could perform.  The ALJ found that Blackwood had the RFC to perform

light work activity, "requir[ing] occasional bending, kneeling and crawling . . ., [being] able

to sit, stand and walk for six hours in an eight-hour workday . . ., [and] lift ten pounds

frequently and twenty pounds occasionally."  T. 15.  Additionally, Blackwood could not

perform any work "requir[ing] fine or detailed use of his vision."  Id.

Blackwood contends that the ALJ used conclusory statements to determine RFC and

did not properly account for the disabling effects of his degenerative disc disease and

glaucoma.  The regulations permit the ALJ to rely on the opinions of non-examining

sources to override treating sources' opinions as long as they are supported by medical

evidence in the record.  See 20 C.F.R. § 404.1527(f); see also Schisler v. Sullivan, 3 F.3d

563, 568 (2d Cir. 1993).  As previously discussed, the ALJ's decision to grant Dr. Abeles'

report controlling weight is supported by substantial evidence, as is the ALJ's decision not

to accord Dr. Jorgensen's opinion or Blackwood's credibility significant weight.  Thus, the

ALJ specifically outlined the limitations presented by Blackwood's back ailment, such as

being restricted in the amount of weight he could carry in a day and the frequency with

which he could bend, kneel, and crawl, and the reasons he determined those limitations.

These limitations are also squarely within the definition of light work.

23

Blackwood also contends that his glaucoma was not properly considered as a factor in determining his RFC.

> Where a person has a visual impairment which is not of Listing severity but causes the person to be a hazard to self and others--usually a constriction of visual fields rather than a loss of acuity--the manifestations of tripping over boxes while walking, inability to detect approaching persons or objects, difficulty in walking up and down stairs, etc., will indicate to the decisionmaker that the remaining occupational base is significantly diminished for light work . . . .

SSR 84-14.  In this case, the record is devoid of any contentions that Blackwood would be a hazard to himself and others.  The ALJ based his RFC determination on medical evidence which demonstrated that Blackwood's eyes were normal, he had full visual fields, and there was no damage to his optic nerve.  The ALJ clearly considered these factors in determining Blackwood's RFC as he indicated that Blackwood was precluded from doing any jobs which required fine vision skills.  However, the ability to perform fine visual skills is not the correct standard with which to determine RFC.  Thus, the ALJ's decision was again supported by substantial evidence and the slight non-exertional limitations which were imposed were not significant enough to erode Blackwood's occupational base.

Accordingly, the Commissioner's determination in this regard is affirmed.

## VI. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the decision denying disability benefits be **AFFIRMED**, Blackwood's

motion for a finding of disability (Docket No. 8) be **DENIED**, and the Commissioner's

cross-motion (Docket No. 13) be **GRANTED**.


DATED: June 23, 2008
    Albany, New York

_____

United States Magistrate Judge

25